We very much appreciate the return visit necessitated by the Supreme Court's decision. United States v. Martoma. Here are the appellants. Mr. Clement. Thank you. Good morning, your honors, and may it please the court. Paul Clement, the appellant. There is a common thread that runs through Salmon, Newman, and Dirks. In each of these seminal cases, the court rejected the government's argument that any conveyance of material non-public information for a non-corporate purpose necessarily benefits the insider and imposes criminal liability on both the tipper and the tippee. The government has quite literally gone 0 for 3 in swinging for the fences. Those cases all underscore that something more is needed, and that something more is a personal benefit to the insider. You do concede that the court in Salmon did cut back on Newman's holding. It did, but I think it cut back in a very particular way, which is the court, I think correctly, read this court's decision in Newman as imposing a conjunctive requirement that there be a meaningfully close personal relationship and an exchange that generates an objective, consequential, and significant exchange. That wasn't overturned, that's from Newman, it wasn't overturned by Salmon. No, it was overturned, and I'll use the Supreme Court's terminology, to the extent that when you have brothers, and I'll grant you someone else in a meaningfully close personal relationship, you don't also need an objective, consequential, and significant exchange. But I think the simplest way, I think, to put the point is I think Newman, I think initially intended those to be conjunctive requirements, and now after Salmon, they're disjunctive. What does meaningfully close relationship mean? How do we put teeth into that? Well, I think the best way and the way that would be most faithful to Salmon and Dirks is to say it's the kind of relationship in which the two individuals would exchange other gifts. I think that's what essentially makes the gift analogy work in Salmon and in Dirks. If you have the kind of relationship, and I- Kind of a relationship here to the extent that perhaps it's a combination of a friendship and a business relationship. They were building this relationship that had started two years earlier. Couldn't a jury have so found? Well, two things, Judge Chin. First of all, the jury wasn't asked to find that at all, which I think is a problem just right there. I think the jury would have difficulty finding that in this case at all. Because I do think, the way I think about it, there is sort of a spectrum of close friendships, and on the one hand, you have Salmon. I think somewhere in the middle, frankly, you have the facts of Newman, where you had co-alumni of the same business school. You had people who socialized together and went to church together. And I really think that Martoma and Gilman and Martoma and Ross are on pretty much the other end of that spectrum. And I think it would be kind of gobsmacking to me- This was a quasi-friendship, quasi-business relationship. One could certainly, as the government argues, find that the tipper was looking to continue this relationship, to look for future opportunities to build on this relationship that had been existing for a while now. Well, your honor, of course- That would be of personal benefit. Well, I think that would be more of a classic pecuniary benefit. And I think that that theory was available to the government, but I think in fairness, there were problems with that. And the biggest problem- Both sides have been shifting in their arguments as, understandably, the law has been evolving. I was concerned before Salmon with the jury instruction. It seemed to permit the jury to convict without any pecuniary value or equivalent. And now, in light of Salmon, is there- What is the error, if any, with the jury instruction? The jury instruction error is- I think I could go on and on, but I think the nub of it is that it didn't require there to be an existing, meaningful, close, personal relationship. To the contrary, it would allow the conviction based on an interest in developing a friendship. And I think that has to be wrong. I mean, whatever the exact line is for meaningfully close- Has there been any case before Newman that require a close, personal relationship? Well- In the way that you just described. In other words, it's not in the charge. And so, is it that Newman now imposes that requirement and the Supreme Court has not set that part aside, is the argument? I think that is the argument. I mean, I would say that Newman believed, and I think was in this respect, faithfully interpreting Dirks. So, I could say it was implicit in Dirks, but the point that it becomes explicit is in the Newman decision. And I think there's a certain irony here, because obviously Newman comes first. But in a way, I think in the light of Salmon, you kind of need the Newman test more than ever. Can I ask you this? I mean, help me with this. Trying to get at the, there seems to be a tension, if you could help me understand this, between Newman's meaningfully close personal relationship language. And Salmon's reiteration of the Dirks concept that tips of inside information given in lieu of a cash gift bestow a personal benefit on a tipper. Let me give you an example, if you could help me. So let's take the example of, let's say, a doorman, and it's Christmas time. And instead of a cash Christmas bonus, the resident gives his or her doorman a tip of inside information. Now there's not a meaningfully close personal relationship. But on the other hand, a tip of inside information in lieu of a cash gift is the most, it seems to be a concrete example of the kind of thing that the Supreme Court is talking about in Dirks and So could you help me understand sort of how we parse all this out? Sure. I mean, I think, frankly, the doorman's case is, or doorperson's case is a harder case than this one. Because there, and I think there's two ways that you could potentially get at the sort of the case of the doorperson. One is, you might be able to say that it's meaningfully close personal relationship. It doesn't strike you as obviously one, but at least it's better than this. Because at least it's a relationship that's occasioned by gift giving. I think you also might be able to get to that case based on the other part of the Newman test. Which is to say, at the point that this is really in lieu of a tip. And it might make a difference whether he typically gave five bucks or typically gave $1,000. But if it was a substantial tip in other years, and this year sort of went on the cheap, he kept the $500 in his pocket and gave a tip instead. That does seem like the kind of personal benefit that counts for purposes of Duke and Salmon, and I would say Newman. So- Does meaningfully close personal relationship to you mean ongoing relationship? Are they the same or are they different? Well, no, I think they're different. I think it's more than just an ongoing relationship. There are a couple of ways to come at the meaningfully close personal relationship. To me, the way to come at it that tethers it most closely to Salmon and the gift analogy is the kind of relationship where gifts are in fact exchanged. And I think the case from the first circuit, the Bray case that we brought to the court's attention in the 20HA, is a nice example. Because there, it's not a familial relationship, but it's a personal relationship that develops over the course of a decade. And critically, you have the outsider there, but I think it's analogous. You have a situation where they're giving significant gifts. They're giving $1,000 cash gift for a graduation. They're giving a set of golf clubs. You could see why that kind of thing would give rise to a meaningfully close personal relationship. I really don't think that you had that here. And to be clear, I think to give you an illustration of how far I think the law still has changed from pre-Newman to where we are now, when Judge Gardafi looked at the evidence in this record applying the pre-Newman law, he found that there was a sufficient personal friendship, not just between Gilman and Martoma, but between Ross and Martoma. And the government on appeal isn't even arguing that there's a close personal friendship between Ross and Martoma. Actually, counsel, the last time the government was here on this case, they said, there's no chance, though, that the jury convicted Martoma on a pure friendship theory. It's logically impossible. Boy, I mean, first of all, they may have said that, but they must not know what logically impossible means. Because there's just no way, when you give this kind of disjunctive instruction, that it is logically impossible that the government, that the jury came out in that conclusion. This would also come as a surprise to Judge Gardafi, right? Because Judge Gardafi looked at the sufficiency of the evidence, and he thought that there was sufficient evidence, pre-Newman, of both a financial quid pro quo and friendship. What Newman did, really, is have us focus on the strength of the relationship. That's what close personal relationship means. And we didn't have that closeness and personalness before Newman. That's exactly right, Judge Pooler. And like I said, I think the irony is, I think Solomon makes focusing on that all the more important. Because if you go look at the transcript in the Solomon argument, I mean, the Supreme Court obviously was an eight justice court, they were looking to decide the case narrowly. But they were very concerned about this idea that this would extend beyond the facts of that case, which were brothers, which was the easiest case in the world. And they were concerned that it would apply not just to friends, but to acquaintances. That was a term one of the justices used. And I think, given that where I take the state of the law to be, is that in some relationships, you do still need to show an objective, consequential, and significant exchange. And in others, the relationship is sufficiently strong that you can sort of implicitly assume the exchange. To me, that just puts more pressure on defining what kind of relationship is sufficiently close to obviate the need to show something more. Thank you. I have one more question. At our last meeting, before, after Newman, but before Salmon, Judge Chen asked the government, is it possible that the jury convicted because they found Dr. Gilman provided the information to develop or maintain a friendship? And the government answered, I suggest that is not possible, your honor. And the reason is that any friendship that Dr. Gilman may have had with Mr. Martoma was part of and inextricably intertwined with their pecuniary relationship. Can the government now argue friendship after that? Well, they think they can, because they already did it in their supplemental brief. So, and as I say, I think that just suggests that perhaps the government was using the term impossible in a very loose sense. Because I think, I just don't see with this instruction, and especially when read in light of Judge Gardafi's Rule 29 opinion. I just don't see how you could say that it's impossible. I think it's actually quite likely that the jury could have gone off on that. Again, Judge Gardafi thought it was possible they could get a friendship out of the Ross-Martoma relationship, and not even the government has argued that. Thank you. Thank you. Mr. Allen. Good morning, your honors, and may it please the court. My name is Robert Allen, and I represent the United States on appeal. I want to start with one argument that Mr. Clement made in response to questions from the court. The question was, what does it mean to have a meaningfully close personal relationship? And the response was, well, that means relationship where it would be possible that one person might give another person a gift. And that shows the problem with the argument as applied to the jury instructions in this case. Because the jury was instructed in part, and this is the part of the instruction that Martoma objects to, that to the extent there's a gift for the purpose of maintaining or developing a personal friendship, that gift can suffice for personal benefit. So to the extent meaningfully close personal relationship just means a relationship in which it is possible that someone might gift another person. That is what the jury was instructed in this case. And that is also what the jury was instructed in United States versus Salmon, which the Supreme Court specifically said was an appropriate instruction that properly told the jury the actual law. Notably, the jury in Salmon was not given the meaningfully close personal relationship instruction that Mr. Clements says should be required. The Supreme Court, though, of course, looked at Newman and said nothing about the meaningfully close relationship prong. What are we to make of that? They said something about other parts of Newman, but they didn't say anything about that. So doesn't that mean that meaningfully close relationship survives in some way? There's still the question of figuring out what that actually means, but doesn't that survive? Of course, Your Honor, so a couple responses to that. First, the Martoma tries to argue that this is a conjunctive requirement. In other words, that Newman said there are two parts to the test, and that is not what Newman said. Newman said that an inference is impermissible in the absence of a meaningfully close personal relationship that generates an exchange that is pecuniary in nature. It was, in essence, in an effort to impose a transactional requirement on the gift-giving language in Dirks. And the Supreme Court said that to the extent a pecuniary or other benefit must be exchanged, that is impermissible, or that is not what Dirks says. It did not specifically address the meaningfully close personal relationship part of Newman. But on the other hand, it also did not engage in any analysis of whether the relationship between Maher and Michael Cara in that case, the tipper and the tippee, was meaningfully close or was not meaningfully close. The government in Salmon, and correct me if I'm misapprehending, argued to the Supreme Court that a gift of confidential information to anyone, not just a trading relative or friend, was sufficient to establish insider trading liability. And the Supreme Court declined to take up that view. What do we make of that? So that was the government's argument, and that argument is based on what Dirks says. Dirks says the question is the purpose of a disclosure. And to the extent a disclosure of confidential information is made for an authorized corporate purpose, then that disclosure cannot be a breach of fiduciary duty to shareholders or to the owner of information in a misappropriation case. To the extent the purpose of a disclosure, however, was unauthorized, was for personal benefit, then that would affect a breach of fiduciary duty and would give rise to liability for insider trading. It doesn't really make sense in that framework to say that it's meaningful that a gift to one person is different from a gift to a separate person. A gift to a doorman is just as impermissible and improper a use of corporate information as a gift to one's brother or sister. In any event- How does that meet the test of the meaningful close relationship? The gift to the doorman? Or you say it doesn't have to? Well, that's not the test. I think the test under Dirks is whether a use of information is improper or is proper. In other words, is an authorized use of corporate information or is not. And to the extent an insider is using corporate information as an emolument of his office, in other words, the extent a corporate insider is using information for self-dealing for his or her own purposes, that is improper. Now, look, while the Supreme Court did not directly address this point in Salmon, it's only because it found that the case was so easily disposed of by the actual language in Dirks. And in so doing, it said that the language in Dirks, that a gift to a, quote, trading friend or relative is sufficient to infer a personal benefit, was a holding of that case. What was Dr. Gilman's personal benefit here? So the personal benefit that was argued at trial was in part that he would receive, quote, frequent and paying consultations with Martoma. He was making $1,000 an hour for those consultations. There were 43 consultations, and he made around $70,000 total. His consulting income- Not for the meeting at which he told him about the drug failure, isn't that correct? He did not bill for that particular meeting, and the reason why is directly explained on page 1918 of the transcript. And that is because if he did, if he had billed for the July 17th and the July 19th consultations, it would have been, quote, tantamount to confessing that he was feeding Martoma inside information, end quote. So of course he didn't bill for those particular meetings because it was too obviously a crime, and he explained that. But those meetings occurred in the context of a relationship where he was being paid $1,000 an hour to provide inside information to Martoma. Every time there was an SMC or Safety Monitoring Committee meeting, Gilman met with Martoma the next day or the same day in some instances and provided him inside information about those meetings. And so when Martoma asked to speak with him on July 19th and July 17th, and when Martoma got inside information on those meetings, it occurred in the context of that relationship. And I think it's- Was he ever asked Gilman directly at trial why it was that he gave the insider a trade of information? You know, I don't think he was really directly asked that. And I don't think he was really directly asked that by either party. But what he said, you know, when asked, did you know it was intentional. It might have been helpful to know. He was asked about it, I think, in different ways, though. He was asked, did you know it was intentional? The answer was yes. In other words, I intentionally gave him information that I knew I shouldn't have. And he explained that he had a relationship with him, and he explained that he viewed him as his own child, almost, who he had lost under tragic circumstances. So there are a lot of different reasons, I think, that Gilman provided the information to Martoma. And it's oftentimes the case, in criminal cases, that people engage in criminal behavior and the precise reason why they're doing it is not necessarily clear to them at the time. But look, there's a claim, and I want to be clear about one thing. There's a claim in the defense's briefs in this case that there was a disavowal by Gilman of this information being given in exchange for consulting fees. And that claim is just not true. And there's a portion of the transcript the defense cites, too. It's pages 178 and 179 of the joint appendix, where there are a series of questions where Gilman is asked, did you bill for the July 19th, July 17th meetings? And the defense makes it seem like he says, no, I didn't bill because I wasn't doing it for money. And that's not at all what the transcript actually says. The transcript actually begins with a question that is, quote, aside from the fees that you made at GLG for your consultations, you never got a penny extra for Mr. Martoma for the July 17th and 19th meetings. Is it the government's position that there was a close personal relationship here? Do you have a position? Is it that it doesn't matter? Well, look, to the extent the court were to say the jury should have been instructed that a meaningfully close personal relationship were required, it wouldn't have made a difference here. And the reason why is because there was such a relationship. And- Are you arguing that they had a meaningful close relationship? Yes, we are. Gilman and Martoma? Yes, they did. They definitely did. And especially when it seems that a relationship with a doorman, under the defense's standard, would be enough. The relationship here is much closer than the relationship with a doorman. This was a two year consulting relationship. And this is, by the way, this is explained on pages 1236 to 39 and 1836, I believe, of the transcript. There was a two year consulting relationship. During this relationship, Martoma actually intentionally tried to foster a close relationship with Gilman. And the reason that he did that was obvious. It was because he wanted to milk him for inside information. So during this relationship, the testimony established that Martoma flattered Dr. Gilman. He expressly told him, I want us to be friends. I want us to be closer than just consultant and hedge fund manager. And when Gilman was traveling and missed a consultation, Martoma told him he was worried about him. Gilman testified that this touched him. Gilman testified that he liked talking to Martoma, that Martoma asked him penetrating questions. He testified that Martoma reminded him again of his son who had passed away. Can it be a close personal relationship if it only goes one way? You're suggesting Martoma was acting fraudulently in trying to create this relationship. How can that be a close personal relationship? Well, two responses. One, Your Honor, it would be a very perverse rule, I think, to say that the relationship has to be two ways. And therefore, to exclude liability in a situation where, as here, someone intentionally fosters relationship to try to get information. That is conduct that should not be sanctioned by the law. And second, what matters under Dirks is the purpose of the disclosure. In other words, the purpose of the tipper. Here, the tipper is Gilman, and so what matters is why Gilman was disclosing information. And if Gilman was disclosing information in the context of a friendship, then again, that is an improper use of corporate information for personal benefit under Dirks. So it doesn't matter whether it's both directions. What matters is why Gilman was disclosing information. And Gilman was disclosing information because he thought he was friends with Martoma, and he expressly testified that. He thought he was friends with Martoma. You're also saying, though, I thought that there was a financial benefit, a quid pro quo. And there was, Your Honor. And again, the law is clear here, or at least the law is clear in the context of bribery cases, that you don't need to have an express match between the quid and the quo. In a case, I would cipher that as United States versus Ganim, 510F3D134, a case of this circuit in 2007. Here, you have a relationship where Gilman is being paid $1,000 an hour to consult with Martoma. That relationship progresses because Gilman is giving him inside information. And so that is the reason that Gilman continues to do it. Because as we argued in summation, the consultations were frequent and paying. The jury wasn't certain about what the money meant. They asked the judge, does the term a personal benefit include the consultation fee paid through GLG? That's the question the jury had before they reached a verdict. So I'm not really sure that you can draw much meaning from a jury question. Juries ask all kinds of questions, and it's hard to know what's going on in their heads. That said, it's a fair question, and I think the response of the court was to reread the personal benefit instruction. And the answer to that question is yes, of course a consulting fee can count as a personal benefit. But the jury wasn't asked to find that. The jury was just told that it is what you think it is. Well, that's true, but the jury was instructed that a personal benefit can include a quid pro quo. And the instruction is on page 3191 of the transcript, and it includes developing or maintaining a business contact, or a friendship, or enhancing the tipper's reputation. And that would include maintaining a very lucrative consulting relationship with Gilman. And Counselor Wright, as you stand here today, do you still think it's a logical impossibility to have the jury decide on the basis of friendship? I think that that argument was made in the context of a harmless error standard. So in other words, if the jury were instructed as the defense wanted, it would not have made a difference. It was said, I think by you, I'm not sure, that it's a logical impossibility that the verdict could be based on a friendship. I think given the strength of the evidence here, which again is largely incontroverted, about a very significant pecuniary relationship, a consulting relationship between Gilman and Martoma. I think it is impossible to think that a jury would not have found that evidence sufficiently compelling to find a pecuniary benefit in this case. So that means it's irrelevant that Gilman looked at him as a punitive son. That's irrelevant. Well, it's a reason why any error would be harmless beyond a reasonable doubt. But I think here that this was a pecuniary case and that's how the jury decided it. Thank you. Thank you. Mr. Clement. Just a few points in rebuttal. First of all, it's important to recognize that in the Solomon case, it wasn't a case about instructional error. It was a sufficiency of the evidence case. At the very end of the opinion, the court comments on the instruction, but it's commenting on the first sentence of the instruction. It does not have the whole instruction in front of it. It doesn't have the second sentence, which is the one that talks about the nature of the personal benefit. It's also a fact that the instruction in Solomon is material different. It just mimics the language of Dirks. It says trading relative or friend. I still think that instruction would be inadequate in the Second Circuit, but it's a much better instruction than the one that was here, which allows a finding of personal benefit just with the interest of developing a friendship that doesn't yet exist. The second point is the government suggests that it doesn't read the Newman case as imposing a conjunctive requirement of both a meaningfully close personal relationship and a meaningful exchange. Well, the government read it differently in their cert petition in Newman. I can tell you that, because I re-read it. And- Is it Mr. Martoma's position that you always have to have a close personal relationship? Definitely not. It's, and I think- And absent some other pecuniary benefit, it really is a proxy for a personal benefit. Exactly, your honor. I think there are a universe of relationships, and brothers certainly qualify, and I would imagine sort of bosom buddies going way back qualify, where you sort of obviate the need to show any other kind of personal benefit. It's implicit in the relationship. But I think that's got to be a narrow universe, and when you don't have that, you have to show the kind of benefit that Newman talked about. So I think it is a conjunctive test. Why isn't, putting aside, let's assume there wasn't a close personal relationship, why isn't what the government has pointed to enough? That is, if you look at the entire relationship, and being paid for 43 meetings, and the anticipation of further meetings, and further income, why isn't that enough? Well, there's two issues in this case, right? I mean, there's the sufficiency of the evidence issue, and there's the jury instruction issue. Now, I think that because of the way this case was tried, there's not enough evidence there of a pecuniary benefit. But at a bare minimum, given this instruction, it would have been very easy for this jury to have gone off, not on the pecuniary benefit side of the case, which got complicated, but on the friendship side. And that's consistent with the way that Judge Gardefee looked at it in his Rule 29 hearing decision. And I think it's important to remember that as this case developed, as Judge Pooler alluded to, that a problem developed in the government's financial benefit theory. Because all of these paid consultations involved the safety data, and that's not what drove these trades. And it was the July 17th and the July 19th meetings where the efficacy data that showed the drug failure, that's where it was passed. And Gilman's testimony is unequivocal. He got nothing for that. And so, in a different world, there might have been a way for the government to try to come back and repair that, and provide a whole bunch of other evidence of financial benefit, or maybe it was a quid pro quo. But in the pre-Newman world, they didn't have to. They just shifted gears. And at that point down below, they talked about friendship and cup of coffee and reminded him of his son. And that's precisely what you can no longer do in a post-Newman world. You have to either show a meaningfully close personal relationship, or you have to show a quid pro quo or an exchange. And that's just not what the jury instruction here remotely require. Thank you, Your Honors. Thank you both for your arguments. The court will reserve decision. We will recess for a few minutes. The court is standing in recess.